# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

JON H. WARD,                                    :

                Plaintiff,

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                Defendant.                   :

Case No. 3:08-cv-131

District Judge Thomas M. Rose
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial

gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on October 6, 2004, alleging disability from January 30, 2004, due to feet, ankles, hips, shoulders, and low back impairments. (Tr. 75-77; 106-09). Plaintiff's application was denied initially and on reconsideration. (Tr. 53-55; 57-59). A hearing was held before Administrative Law Judge Melvin Padilla, (Tr. 359-87), who determined that Plaintiff is not disabled. (Tr. 16-34). The Appeals Council denied Plaintiff's request for review, (Tr. 6-8), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that Plaintiff has severe residuals of right foot injury (fractures of the first metatarsal and mid foot strain), remote history of fractures and surgeries to the ankles/feet, tendinopathy in the shoulders, and adjustment disorder with features of depression and anxiety, but that he does not have an impairment or

3

combination or impairments that meets or equals the Listings. (Tr. 22, ¶ 3; Tr. 27, ¶ 4). Judge Padilla also found that Plaintiff has the residual functional capacity to perform a limited range of light work. *Id.*, ¶ 5. Judge Padilla then used sections 202.20 through 202.22 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 33, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 34).

Plaintiff sustained a work-related injury to both feet and ankles in April, 1995. *See,* Tr. 365). Plaintiff sustained a second work-related crushing injury to his right foot on January 24, 2004, when a heavy crane outrigger fell on his right foot. *See,* Tr. 142.

Plaintiff received treatment from Dr. Laughlin during the period February through September, 2004, for his work-related injury. (Tr. 134-42). During that time, Dr. Laughlin noted that Plaintiff had developed bilateral shoulder pain with signs of impingement and Dr. Laughlin attributed the shoulder impairment to Plaintiff's use of crutches. *Id.*

Examining psychologist Dr. Lyall reported on November 23, 2004, that Plaintiff used a cane, was quite nervous and somewhat hyper, was oriented, and that he spoke in a relevant and coherent fashion. (Tr. 143-46). Dr. Lyall noted that Plaintiff reported a history of post-traumatic stress disorder, that he seemed to be of low to average intelligence, and that his diagnosis was adjustment disorder with mixed emotional features. *Id.* Dr. Lyall assigned Plaintiff a GAF of 60 and opined that his ability to relate to others was mildly to moderately impaired, his ability to understand and follow instructions was unimpaired, his ability to maintain attention and perform simple repetitive tasks was mildly impaired, and that his ability to withstand the stress and pressure

4

associated with day-to-day work activity was mildly impaired. *Id.*

Examining physician Dr. Anaya reported on December 16, 2004, that Plaintiff's right lower extremity showed significant abnormalities in the ankle and foot joint with moderate decrease in range of motion in plantar flexion and dorsiflexion, that he had a severe decrease in range of motion in inversion and eversion, and that his right lateral malleolus was very thick with a surgical scar running longitudinally across his lateral right foot up to his ankle. (Tr. 162-69). Dr. Anaya also reported that the dorsal aspect of Plaintiff's right foot in the mid section showed a bony overgrowth, that the left lower extremity showed mild decrease in range of motion in all directions in the ankle joint with a left lateral scar along the lateral border of his foot going upwards toward the ankle. *Id.* Dr. Anaya noted that Plaintiff walked at a normal pace but used a cane to support his right lower extremity, that his neurological exam was normal, and that his speech, memory, and comprehension were normal. *Id.* Dr. Anaya opined that Plaintiff had significant skeletal disease in his right foot and likely would have difficulties with any significant walking or standing, that he should not have difficulties with very transient standing and very transient walking, nor should he have difficulties with sitting or handling light objects with his upper extremities. *Id.*

Examining physician Dr. Jurenovich reported on January 3, 2005, that Plaintiff walked with an obvious limp, used a cane for ambulatory assistance, exhibited obvious impingement signs in both shoulders, and that he had painful ranges of motion in both shoulders. (Tr. 170-73). Dr. Jurenovich also reported that Plaintiff's feet showed essentially no motion on the right side which was indicative of his subtalar fusion procedure performed ten years ago, that there was very minimal range of motion in the left ankle, and that he had good flexion and extension of his toes bilaterally. *Id.* Dr. Jurenovich noted that Plaintiff had not reached maximum medical improvement

and that he could not return to his former position of employment. *Id.*

Plaintiff began receiving treatment from Dr. Steurer on January 5, 2005, at which time Dr. Steurer reported that Plaintiff walked with a cane, had a limp on the right side, had tenderness and soreness with swelling in the right foot, and that he had pain in both shoulders. (Tr. 261). Dr. Steurer also reported that x-rays of both of Plaintiff's shoulders were normal, an x-ray of his right foot showed screws in his calcaneus, a healed first metatarsal fracture, and some midfoot arthritis with some spurring. *Id.* Dr. Steurer identified Plaintiff's diagnoses as right foot sprain with first metatarsal fracture and bilateral impingement syndrome to the shoulders and he recommended a therapy and exercise program. *Id.* An MRI of Plaintiff's left shoulder performed on January 28, 2005, revealed tendinopathy of the anterior distal aspect of the supraspinatus tendon without complete tear and slight acromioclavicular joint separation with fluid in the gap. (Tr. 174). Plaintiff subsequently participated in a physical therapy program. *See,* Tr. 206.

Plaintiff continued to receive treatment from Dr. Steurer who reported that Plaintiff complained of pain in his right foot and shoulders and that he continued to use a cane and had an awkward gait. *See,* Tr. 255.

On Dr. Steurer's recommendation, Plaintiff consulted with podiatrist Dr. Grossman who reported on November 7, 2005, that Plaintiff walked with a cane, had an antalgic gait, and that he had claw toes deformity of the right foot. (Tr. 252-53). On January 10, 2006, Dr. Grossman performed a surgical procedure which included removal of the internal fixation device of the right foot, Dwyer calcaneal osteotomy of the right foot, peroneal tendon transfer on the right, excision of calcaneal exostosis of the right root, and multiple arthrodesis tarsometatarsal joints (one through three with arthroplasty four through five on the right). (Tr. 237-49). Plaintiff continued to receive

6

treatment from Dr. Grossman who noted that Plaintiff continued to complain of considerable pain. (Tr. 274).

Dr. Steurer reported on March 23, 2006, that Plaintiff exhibited shiny skin and hypersensitivity in the right foot. (Tr. 272). Dr. Steurer reported the same findings in May, 2005. (Tr. 268).

Plaintiff returned to Dr. Laughlin's care after he (Plaintiff) moved back to the Dayton, Ohio, area. (Tr. 279-80). On July 3, 2006, Dr. Laughlin reported that x-rays reflected a midfoot fusion of tarsometatarsal joints 1, 2, and 3, and a calcaneal osteotomy. *Id.* Dr. Laughlin noted that Plaintiff was concerned about his treatment, that he was still having a lot of pain, and that he did not think his foot was any better. *Id.* Dr. Laughlin also noted that Plaintiff was able to stand and bear weight on his foot, was using a fracture walker and one crutch, that there was hypersensitivity on the dorsum of the right foot, and that he was very tender along the lateral aspect of the calcaneus. *Id.* Dr. Laughlin noted further that Plaintiff had pain in his left foot, that his diagnosis was status post bilateral calcaneus fractures and right midfoot arthritis status post fusion. *Id.*

Dr. Steurer reported on August 2, 2006, that Plaintiff was able to occasionally and frequently lift and/or carry less than 10 pounds, stand and/or walk less than two hours in a eight-hour day, sit at least six hours in an eight-hour day, that Plaintiff's symptoms were attributable to a medically determinable impairment, and that the severity of his symptoms were consistent with the total medical and nonmedical evidence. (Tr. 281-88).

Plaintiff began receiving treatment from pain specialist Dr. Saleh on August 22, 2006, at which time Dr. Saleh reported that Plaintiff's chief complaint was right foot pain which was constant, sharp, stabbing, burning, excruciating, throbbing/pounding, and squeezing/pressure-like.

7

(Tr. 290-95). Dr. Saleh also reported that Plaintiff complained of hypersensitivity to touch of the right foot as well as pain in his left foot, lower back, hips, and shoulders. *Id.* Dr. Saleh noted that Plaintiff had discoloration of the right foot, psychiatric problems consisting of anxiety/depression/mood swing/inability to sleep, that he exhibited pain behaviors such as splinting, grimacing, and guarding, he walked with a limp favoring the left lower extremity, used a cane and right leg ortho boot, and that he was not able to heel and toe walk. *Id.* Dr. Saleh also noted that Plaintiff had bilateral tenderness of his shoulders, stiff passive range of motion, moderate swelling of his right foot, three surgical scars which were severely tender to touch, severely restricted range of motion of the right ankle, and that there was a fixed flexion contractures. *Id.* Dr. Saleh noted further that there was tenderness over the medial and lateral malleolus, anterior ankle, posterior ankle, the dorsum of the ankle, the Achilles tendon, and on the calcaneus on the right and left, and that Plaintiff was in "excruciating pain" during the examination. *Id.* Dr. Saleh reported that Plaintiff had reduced ranges of motion of the right and left ankles, absent dorsal pedal pulse, decreased capillary refill, and that his right foot was dark and dusky in comparison to the left foot. *Id.* Dr. Saleh identified Plaintiff's diagnoses as sprain of the right foot, closed fracture of the metatarsal of the right great toe, contusion of the right foot, impingement syndrome bilateral shoulders, and post traumatic arthritis of the right foot. *Id.* Plaintiff continued to receive treatment from Dr. Saleh during the period September 18 through December 13, 2006. (Tr. 306-14).

Examining physician Dr. Smith noted on October 11, 2006, that Plaintiff reported that he has had four to five surgeries on his ankle since 1995, and has had a total of 11 surgeries on his legs, that he had a restricted rang of motion of his dorsal lumbar spine, restricted motion of his right hip, his right ankle was solidly fused and showed no range of motion, was immobile and exquisitely

8

tender to touch and any kind of manipulation, and that the skin was cold and moist and brawny in color. (Tr. 296-305). Dr. Smith also reported that Plaintiff had a tender mass over the right heel so that he could not put his whole weight on the right foot, range of motion of his left ankle was normal, there was atrophy in the muscle of the right calf, and that knee and ankle reflexes were absent bilaterally. *Id.* Dr. Smith noted that Plaintiff was unable to lift his shoulders above 90 degrees. *Id.* Dr. Smith identified Plaintiff's diagnoses as multiple fractures of both feet and ankles, post operative fusion of the right ankle and subsequent reflex sympathetic dystrophy of the right foot and left, bilateral Osgood-Schlatter disease, low back pain probably secondary to lumbar spondylosis and degenerative disc disease, bilateral shoulder pain, and possible impingement syndrome secondary to trauma. *Id.* Dr. Smith opined that Plaintiff was able to lift/carry up to 10 pounds occasionally, stand/walk for two hours in an eight-hour day and for 15 minutes without interruption, his ability to sit was not affected by his impairments, and that he could reach occasionally. *Id.*

An October 17, 2006, bone scan revealed an extensive bony reaction in the left mid foot area, either trauma or inflammation of the toenail of the third digit, minimal degenerative changes at the metatarsal phalangeal joints of the first two digits of the right foot, some and limited degenerative changes associated with the first digit of the left foot and in the left hindfoot area. (Tr. 309-10). The scan findings, especially of the right foot, were "not suggestive for reflex sympathy dystrophy". *Id.*

Dr. Saleh reported on February 8, 2007, that Plaintiff was able to lift and/or carry less than ten pounds occasionally, required the use of a hand-held assistive device for ambulation, could stand and/or walk for less than 15 minutes at a time, was required to periodically alternate sitting

9

and standing, and was limited in his ability to push/pull and reach. (Tr. 316-21). Dr. Saleh also reported that Plaintiff's symptoms were attributable to a medically determinable impairment, and that the severity of his symptoms were consistent with the total medical and nonmedical evidence. *Id.*

On May 3, 2007 Dr. Saleh reported that Plaintiff's medication side effects could/would cause drowsiness/dizziness, that they would decrease and/or impede his functional capability with balance/stability, decrease his physical/mental reaction time, and decrease his ability to focus/concentrate on the needed task. (Tr. 322). Dr. Saleh also reported that if Plaintiff was placed in a position that required vibration, heights/moving machinery, there was a high risk of further injury to him or even death. *Id.* Dr. Saleh reported further that chronic pain also posed the similar effects as the adverse medication effects which dually increased Plaintiff's risk factors in any type of competitive work environment and decreased his ability to cope with physical/environmental/social/emotional stressors. *Id.*

The record contains additional evidence which consists of reports from treating physician Dr. Laughlin, examining psychiatrist Dr. Reynolds, and examining psychologist Dr. Halmi. (Tr. 323-58). However, this evidence was not before Judge Padilla. Rather, Plaintiff submitted it to the Appeals Council. Since the Appeals Council denied Plaintiff's request for review, that evidence is not a part of the record for purposes of substantial evidence review of Judge Padilla's decision. *Cline v. Commissioner of Social Security,* 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted).

In his Statement of Specific Errors, Plaintiff alleges that the Commissioner erred by failing to properly evaluate the opinion of Dr. Saleh and by failing to find that he has severe reflex

sympathetic dystrophy. (Doc. 9).

Plaintiff argues first that the Commissioner erred by failing to give the proper evidentiary weight to Dr. Saleh's opinion.

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (alteration in original) (quoting 20 C.F.R. § 404.1502). However, a treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994).

While it is true that a treating physician's opinion is to be given greater weight than that of either a one-time examining physician or a non-examining medical advisor, that is only appropriate if the treating physician supplies sufficient medical data to substantiate that opinion. *See, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461

U.S. 957 (1983); *see also, Bogle v. Sullivan,* 998 F.2d 342 (6th Cir. 1993). A treating physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability. *Id.* Further, the Commissioner may properly reject a treating physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with the other evidence of record. *Cf., Kirk, supra; see also, Walters, supra.*

Judge Padilla explained that he did not give of Dr. Saleh's opinion as to Plaintiff's residual functional capacity essentially controlling weight because it was vague, based in large part on Plaintiff's subjective complaints, and because it was inconsistent with the other evidence of record. (Tr. 30).

Although Dr. Saleh opined that Plaintiff was able to lift/carry less than ten pounds occasionally, that opinion is inconsistent with the other evidence of record. For example, Dr. Anaya opined that in spite of his impairments, Plaintiff would not have difficulty handling objects. Similarly, a physical therapist noted that Plaintiff was able to lift 30 pounds and that he was able to carry his daughter who weighed 30 pounds. (Tr. 220). Finally, the reviewing physicians opined that Plaintiff was able to lift/carry up to 20 pounds occasionally and 10 pounds frequently. (Tr. 193-200). Under these facts, the Commissioner had an adequate basis for not giving Dr. Saleh's opinion as to Plaintiff's residual functional capacity controlling weight.[1]

With the exception of the weight-lifting limitation, Judge Padilla's finding as to Plaintiff's residual functional capacity in consistent with Dr. Saleh's opinion. Specifically, Judge

---

[1] As noted by the Commissioner, assuming *arguendo* that Plaintiff is limited to lifting less than 10 pounds and is therefore limited to performing only sedentary work, the VE's testimony establishes that there is a significant number of sedentary jobs in the economy that Plaintiff is capable of performing. *See* Tr. 383-84.

Padilla determined that Plaintiff must be permitted to alternate positions as needed, should avoid climbing ladders or scaffolds, avoid working at unprotected heights, balancing, avoid more than occasional climbing stairs or crouching, and that he is limited to temperature-controlled environments. (Tr. 27). Those limitations are consistent with Dr. Saleh's February, 2007, opinion.

Plaintiff argues next that the Commissioner erred by failing to find that he has the severe impairment of reflex sympathetic dystrophy.

An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 90 (6th Cir. 1985)(citation omitted); *see also, Bowen v. Yuckert,* 482 U.S. 137 (1987).

An ALJ does not commit reversible error in finding a non-severe impairment where the ALJ determines that a claimant has at least one other severe impairment and then goes on with the remaining steps in the disability evaluation, since the ALJ considers all impairments, including non-severe impairments, in determining residual functional capacity to perform work activities. *See, Maziarz v. Secretary of Health and Human Services,* 837 F.2d 240, 244 (6th Cir. 1987).

First, the Court notes that the Commissioner had an adequate basis for rejecting the diagnosis of reflex sympathetic dystrophy. It is, of course, the Commissioner's function to resolve conflicts in the evidence. *Cf., Richardson v. Perales,* 402 U.S. at 399; *see also, Mullins v. Secretary of Health and Human Services,* 836 F.2d 980 (6th Cir. 1987). In the present case, there is conflicting evidence in the record as to whether Plaintiff indeed has reflex sympathetic dystrophy. While Dr. Smith reported that Plaintiff had reflex sympathetic dystrophy, Dr. Smith was a one-time examining

13

physician. (Tr. 296-305). In contrast, treating physician Dr. Steurer reported that Plaintiff, "*may be getting into some early reflex sympathetic dystrophy type problems*". (Tr. 272). Similarly, Dr. Saleh noted that Plaintiff had "*possible* RSD right lower extremity?" (Tr. 306). Further, on January 3, 2007, treating physician Dr. Laughlin reported that he "really do not think he has RSD". (Tr. 315). Finally, the October, 2006, bone scan findings were not suggestive of reflex sympathetic dystrophy. (Tr. 310).

Nevertheless, in determining that Plaintiff is not disabled, Judge Padilla found that Plaintiff has several severe impairments. Accordingly, Judge Padilla did not stop at the second step of the sequential evaluation process but rather went on with the remaining steps in process before determining that Plaintiff is not disabled. Therefore, the Commissioner did err by failing to find that Plaintiff has severe reflex sympathetic. *See, Maziarz, supra*.

Plaintiff also argues that the Commissioner erred by failing to take into consideration his need to use a cane for assistance with his ambulation. However, as noted above, Judge Padilla limited Plaintiff to jobs with a sit/stand opinion. Therefore, because Plaintiff could perform the identified jobs while sitting, his need to use a cane is not particularly relevant to his ability to perform those jobs.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v.*

*Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

March 2, 2009.

                *s/ Michael R. Merz*
                United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).